SARA R. WIDOW OF SALAZAR, Petitioner, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., Respondent. MANAGER OF THE STATE INSURANCE FUND, Intervener.

No. 450. Argued March 2, 1953.—Decided February 25, 1954.

*Luis Blanco Lugo* for petitioner. *Ángel de Jesús Matos* and *Donald R. Dexter* for intervener.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

This case involves a physician whose employment required him to be exposed for 26 years to X-ray irradiations from which he contracted cancer, resulting in his death.

Section 2 of the Workmen's Accident Compensation Act [1] provides for compensation for employees who "suffer *injury*, are disabled, or lose their lives *by reason of accidents* caused by any act or function inherent in their work or employment, when such *accidents* happen in the course of said work or employment, and as a consequence thereof; or such as suffer disease or death caused by the occupations specified in the following section." (Italics ours.) Cancer is not included in the table or schedule of occupational diseases for which compensation may be awarded under § 3 of the Act. Consequently, compensation in this case may be predicated only on a finding that an injury by accident had occurred.

Dr. Guillermo Salazar worked from 1924 until his death in 1950 for the Department of Health of Puerto Rico as a radiologist and physiologist. In the course of his employment he took X-ray pictures and did fluoroscopies of charity patients in order to determine if they were suffering from tuberculosis. With minor interruptions, he performed this work daily for twenty-six years until two weeks before his death at the age of 69.

In 1945 a cutaneous lesion appeared on the ring finger of Dr. Salazar's left hand. He diagnosed this lesion himself as tubercular and received X-ray treatments therefor. In 1949 he made a trip to Spain, where a physician amputated the finger in question on the theory that the lesion was tubercular.

In April 1949, when Dr. Salazar entered the Presbyterian Hospital, he still believed that the lesion on the amputated finger had been tubercular. While he was in the hospital from April 4 to April 10, 1949, other physicians for the first time made a definitive diagnosis that Dr. Salazar had a cancer; it was now recognized that the lesion had been

---

[1] Act No. 45, Laws of Puerto Rico, 1935, as amended by Act No. 8, Laws of Puerto Rico, 1948.

cancerous from its inception. In September 1949 Dr. Salazar's arm was amputated due to the fact that the epidermoid cancer had extended to the scapular area.

On October 6, 1949 Dr. Salazar filed a claim for compensation because of permanent incapacity. While this claim was pending, Dr. Salazar died on January 11, 1950 of a metastic cancer caused by an epidermoid carcinoma. His beneficiary then filed a claim for compensation because of the death of Dr. Salazar. The Manager of the State Fund denied the latter claim, whereupon the beneficiary appealed to the Industrial Commission. The Commission held that the case involved "a typical occupational disease and not a compensable accident of employment." Since cancer is not a compensable occupational disease under our Act, the Commission dismissed the claim, one Commissioner dissenting. We granted the petition of the beneficiary to review the decision of the Commission.

The Commission found that the lesion which first appeared in 1945 was caused by Dr. Salazar's "continuous and daily exposure to X-ray emanations . . . " while he took X-ray pictures and did fluoroscopies of his patients in the course of his employment. There is ample support for this finding in the testimony and the Manager of the State Fund does not challenge it. The medical testimony shows that this lesion—which was mistakenly diagnosed in 1945 as tubercular but was cancerous from its inception—was the first manifestation of the malignancy which thereafter extended to other parts of the body and culminated, after slow progress through a number of years, in the death of Dr. Salazar. There can therefore be no doubt that Dr. Salazar died of a cancer produced by X-ray irradiations to which his left hand was exposed daily and continuously over a long period of years.

The question here of course is to determine if an injury *by accident* occurred. This problem has been largely elimi-

nated in a number of states by establishing all-inclusive coverage for occupational diseases. The distinction between diseases through injury by accident and occupational diseases in those States has become immaterial as compensation is granted in either event. Larson, 1 Workmen's Compensation Law, 580. But this distinction—which can be very troublesome in a close case—persists in Puerto Rico. And it is necessary to draw it in this case: if the cancer contracted by Dr. Salazar in the course and as a consequence of his employment fits into the category of an occupational disease rather than an injury by accident, the claim herein must be denied as cancer is not included in the table or schedule of occupational diseases in our Act.[2]

We are not concerned here with two questions which have caused considerable controversy in other jurisdictions. *First*, we assume, for present purposes and in the context of the facts of this case, that we would follow the rule that an injury by accident may occur (*a*) without the happening of some external event and (*b*) whether the exertion or circumstances be usual or unusual. *Gray's Hatchery & Poultry Farms* v. *Stevens*, 81 A.2d 322 (Del., 1950); *Derby* v. *Swift & Co.*, 49 S.E.2d 417 (Va., 1948); *Southern Stevedoring Co.* v. *Henderson*, 175 F.2d 863 (C.A. 5, 1949); *Bollinger* v. *Wagaraw Bldg. Supply Co.*, 6 A.2d 396 (N.J., 1939); cases cited in *Kelly-Springfield Tire Co.* v. *Daniels*, 85 A.2d 795, 797 (Md., 1952); *Neylon* v. *Ford Motor Co.*, 91 A.2d 569, 570 (N.J., 1952) as compared with the same case in 86 A.2d 577 (N.J., 1952); 53 Col.L.Rev. 130, and cases cited; Larson, *supra*, p. 516 *et seq.*; 27 N.C. L.Rev. 599; Horovitz *on Workmen's Compensation* 88; 5 Schneider, *Workmen's Compensation Text* § 1446; 11 N.A.C.C.A. L.J. 76–7. But *cf. Cordero* v. *Indus-*

---

[2] "The schedule list is exclusive, and it is not within the power of the courts to add new items, however obvious an occupational disease the omitted item may be." Larson, *supra*, p. 604; *Henry* v. *A. C. Lawrence Leather Co.*, 57 S.E. 2d 760 (N.C., 1950).

*trial Commission,* 68 P.R.R. 118.[3] *Second,* the fact of causation, *i.e.,* the relation between the disease and the employment, is usually very difficult to establish by credible testimony in this type of case. *Valente* v. *Bourne Mills,* 75 A.2d 191 (R.I., 1950) ; 6 N.A.C.C.A. L.J. 41–6; ,Larson, *supra,* p. 567. In the claim before us no such problem exists. All parties concede that the cancer of which Dr. Salazar died arose in the course and as a consequence of his employment.

Although we need no external or unusual event in this case and although the cancer was clearly caused by the conditions of employment, the question remains whether an injury by accident occurred. In seeking a solution of this problem, many courts, apparently the majority, have developed two tests, which we accept: (1) the injury must be due to an unlooked for mishap or untoward event which was not expected or designed. *Fenton* v. *Thorley & Co. Ltd.,* A.C. 443 (1903) ; *Bollinger* v. *Wagaraw Bldg. Supply Co., supra; Southern Stevedoring Co.* v. *Henderson, supra;* Larson, *supra,* p. 512; (2) the injury must be traceable within reasonable limits to a definite time, place and occasion. *Gray's Hatchery & Poultry Farms.* v. *Stevens, supra;* Annotations, 90 A.L.R. 619; 23 A.L.R. 335; 6 A.L.R. 1466; 97 A.L.R. 1412; 29 A.L.R. 691; 44 A.L.R. 371; Larson, *supra,* p. 513; 25 Harv.L.Rev. 328,338 *et seq.*[4]

---

[3] As a matter of fact, even if an external event is required, the impact of the X-ray emanations on Dr. Salazar's hand over a period of years probably fulfills this requirement.

[4] It should be made clear that the requirements of unexpectedness and definite time do not necessarily mean that some single incident or event is the only manner in which an injury by accident may occur. *Cf. Atiles, Mgr.* v. *Industrial Commission,* 69 P.R.R. 586, 590. We recognize that this clarification in turn creates a problem: Once we concede that the accident may be more than one event and may occur over a period of time, the problem of definiteness of time or occasion becomes a question of degree and the line between a compensable and non-compensable case may be shadowy in a particular case. But we must draw the line as best we can in the light of the intention of the Legislative Assembly and the facts of each case.

108

We agree that the two foregoing requirements of an accident—unexpectedness and occurrence within a definite time—may be manifested either in the cause of the injury. or the result thereof. *Purity Biscuit Co.* v. *Industrial Commission*, 201 P.2d 961 (Utah, 1949); 9 N.A.C.C.A. L.J. 43–5, and cases cited therein; 5 *id.*, 67–8; 3 *id.*, 96–102: 27 N.C. L.Rev. 599.[5] We thus see that, *first*, an injury by accident occurs if the cause is gradual and imperceptible, as in exposure to dust or poison, provided the result is very definite as to time: a sudden collapse at a particular moment. Larson, *supra*, p. 578, cases cited in footnotes 19–23.[6] *Second*, injury by accident also occurs in the converse case where the cause is abrupt, as in a relatively brief exposure to severe chilling, even though the result is protracted—for example, gradual succumbing to pneumonia. Larson, *supra*, pp. 577–8; *cf.* cases cited in footnote 18. *Third*, where neither cause nor result is at all sudden, a claim cannot be granted on the basis of injury by accident. Larson, *supra*, p. 578.[7]

It is difficult to determine the weight of authority for cases in the foregoing third category. We recognize that some courts have satisfied themselves that an injury by

[5] As already indicated, the accident need not be instantaneous and is not confined to a single incident or event. See footnote 4. But either the precipitating incident or the manifestation of the disability itself must. be of a sudden or reasonably brief character.

[6] In the cases cited in footnotes 19–23 claims were granted in the following situations: "Weeks of overwork and strain may lead to coronary thrombosis; several days' work in heat may cumulatively produce heat prostration; twelve hours' glare of the sun may finally bring on snow blindness; repeated jarrings or strains may ultimately lead to a herniation of an intervertebral disc; or a long period of working in a strained crouching position may culminate in a 'dropped foot'." Larson, *supra*. p. 578.

[7] Larson, *supra*, summarizes the effect of applying the tests of both unexpectedness and definite time, as regards either cause or result, in order to determine if an injury by accident occurred, at pp. 514–5 as follows:

"The potential component parts of the accident concept, under the usual statutory language, may therefore be broken down as follows:

accident occurred by denying the validity of the definite-time requirement. Others have sustained such claims by "the use of the repeated-impact theory, under which each tiny bump, or scratch, or jar, or noise, or impact of a morsel of silica dust on the lungs is regarded as an accidental occurrence." Larson, *supra*, p. 579, and cases cited; *id.*, p. 569, and cases cited in footnote 16, pp. 569–73. But " . . . most of the same jurisdictions [which have found an injury by invoking the repeated-impact theory] have at some time denied compensation for injuries in this category *on the ground that the time of injury was not sufficiently definite.*" Larson, *supra*, pp. 573–4 (matter in brackets and italics ours) ; see cases cited in footnote 17, pp. 574–6. For our purposes, it is important to note that most of the cases in which the claims were denied " . . . fall into the category of injuries whose cause and result were both difficult to locate in time." Larson, *supra*, p. 577.

 It bears repeating that we are not holding that accident under our statutes does not mean that the injury must be traced to a single event. See footnote 4. But we cannot subscribe to the repeated-impact theory *as applied to cases where both the cause and result of the injury were*

---

"I. *Unexpectedness*
"A. Of cause
"B. Of result
"II. *Definite time*
"A. Of cause
"B. Of result.

"If both parts of both elements are satisfied, you have the clearest example of a typical industrial accident, in the colloquial sense: collisions, explosions, slips, falls, and the like, leading to obvious traumatic injuries.

"*At the other extreme, if all elements are missing, you have the typical occupational disease. The cause is characteristic harmful conditions of the particular industry. The result is a kind of disability which is not unexpected if work under these conditions continues for a long time. And the development is usually gradual and imperceptible over an extended period.*

"Between the two extremes lie the combinations which are the subject of the ensuing sections, and which have produced and are continuing to produce a tremendous volume of litigation in all jurisdictions whose statutes require proof of accident." (Second italics ours.)

*gradual and protracted as in the instant case over a long period of years.* To apply that theory to such cases would be to eliminate by judicial fiat the distinction written into our statute by the Legislative Assembly between injury by accident and occupational diseases.

Unexpectedness and time-definiteness are precisely the tests which are utilized to distinguish between an injury by accident and an occupational disease. Larsen, *supra*, after analyzing a host of cases, states the guiding principles to be followed in the solution of this problem at p. 600 as follows: " . . . As the preceding sections have shown, the two crucial points of distinction between accident and occupational disease were the element of unexpectedness and the matter of time-definiteness. What set occupational diseases apart from accidental injuries was both the fact that they could not honestly be said to be unexpected, since they were recognized as an inherent hazard of continued exposure to conditions of the particular employment, and the fact that they were gradual rather than sudden in onset. Thus, what would ordinarily be an occupational disease might be converted to an accident by an unusual and sudden dosage of the same kind of dust or fumes that, absorbed gradually over a long period, would produce typical industrial disease. Again, occupational disease might be transformed to accidental by the presence of some untoward little incident or breakage or abnormality, like getting anthrax through a scratch, or absorbing harmful fumes because of an accidental defect in a gas mask. . . . " See also footnote 7 of this opinion.

The beneficiary argues that since an accident is not confined to a single event, an injury by accident occurred here by virtue of the daily and continuous X-ray emanations which were repeated, successive traumas on Dr. Salazar's left hand. We cannot agree. We think the facts found by the Commission concerning which there was no dispute show that the injury here does not meet the tests of unexpected-

ness and time-definiteness. It "could not honestly be said to be unexpected, since [it is] . . . recognized as an inherent hazard of continued exposure to conditions of [his] . . . particular employment . . . ". And a disease which took from 1924 to 1945 to produce the first manifestation—the lesion which appeared in 1945—and finally resulted in death in 1950 did not occur suddenly or within a reasonably brief period of time; obviously, it was "gradual rather than sudden in onset." The holding that this is a case of occupational disease rather than injury by accident under our Act therefore seems inevitable to us.[8]

Cases like *Pittman* v. *Pillsbury Flour Mills*, 48 N.W.2d 735 (Minn., 1951); *Boyd* v. *Young*, 246 S.W.2d 10 (Tenn., 1951); *Southern Stevedoring Co.* v. *Henderson, supra; Valente* v. *Bourne Mills, supra; Purity Biscuit Co.* v. *Industrial Commission, supra; Bollinger* v. *Wagaraw Bldg. Supply Co., supra*, are distinguishable because the finding of an injury by accident in those cases can be traced to an event or events which occurred suddenly or within a reasonably brief period. But *cf. Scobey* v. *Southern Lumber Co.*, 238 S.W.2d 640 (Ark., 1951). In the *Bollinger* case the court

---

[8] As noted above, there is a division of authority in this situation. Some cases circumvent the requirement that an injury by accident must be traceable to a definite time interval (1) by focusing on the ultimate physical change as the injurious event or (2) by characterizing the gradual deterioration as a series of repeated traumas. Risenfeld, *Forty Years of American Workmen's Compensation*, 7 N.A.C.C.A. L.J. 15, 28, and cases cited. As to (1), we are aware of the argument that the accident occurred on the date in 1945 when the threshold of resistance against cancer was finally pierced by the impact of the X-ray irradiations, *i.e.*, when the precancerous cells were converted for the first time into cancerous cells. Apart from the fact that there was no medical testimony or findings by the Commission along this line, such a conclusion ignores the effects of the X-ray emanations over the years. If we bear in mind that our statute distinguishes between injury by accident and a limited schedule coverage of occupational diseases, we must conclude that the cancer was caused by the effects of the X-ray emanations over the years, and not merely by the impacts of a single day in 1945. As to (2), we have already indicated why we cannot follow that theory in this particular case.

found that an injury by accident had occurred inasmuch as a pigmented mole on the foot of the employee was irritated and converted into cancer in a single day by the sand and ashes which inevitably found their way into his shoes while he made building blocks out of ashes, sand and cement. In the *Bollinger* case the court in effect describes the difference between its facts and the instant case at p. 399 as follows: "An occupational disease is one that from common experience is visited upon persons engaged in a particular occupation, in the usual course of events. It is one that is incidental to the employment itself, e.g., painters become affected with lead colic or lead poisoning; telephone operators develop ear trouble; phosphorous poisoning is common to those who work in the manufacture of fireworks. These examples might be multiplied. In such instances they are injuries or diseases common to workers in those particular trades and, manifestly, do not usually arise by accident as the term 'accident' is commonly understood. Such diseases are not compensable unless made so by statute." Substantially to the same effect, *Stepnowski* v. *Specific Pharmaceuticals*, 87 A.2d 546 (N.J., 1952). And, it may be added, physicians who expose their hands to X-ray radiations for a period of many years in the course of their employment may, "in the usual course of events" and "incidental to the employment itself" contract the disease of cancer. Under those circumstances, the injury is an occupational disease, *not an injury by accident*.

Perhaps the best way to illustrate why the present case involves an occupational disease is to present a different hypothetical case. If Dr. Salazar, in the course of administering X-ray treatments to patients, had burned his hand on one or several reasonably identifiable occasions and had thereby contracted or aggravated a cancer he already had, the case would be one of injury by accident. But the manner and time in which the disease was contracted here makes it a typical occupational disease.

The dilemma with which we are faced in the instant case has been stated succinctly by Horovitz, *supra,* at p. 84: "Employers also argued that though silicosis, benzol poisoning, and various *industrial or occupational diseases* resulted from a series of personal injuries, they were not compensable because each personal injury was not 'by accident.' 'By accident' connoted something sudden, unusual, unexpected —an unlooked for mishap or an untoward event which is not expected or designed, and industrial diseases were of slow growth, not unusual, and to be expected; and the great majority of accident-requiring states found themselves obliged to deny awards therefor.

"To correct this injustice, many states have either (1) not used the words 'by accident' or (2) added specific provisions to compensate for some or all industrial diseases. Unfortunately, some list these diseases by name, and when a new one appears in medicine, the poor victim gets nothing. All the legislature can do in such cases is to take care of future victims by adding the new diseases to the list. In the meantime the court is powerless to help the victim unless the disease can be termed an injury [in those states where that is sufficient], or an injury by accident." (Matter in brackets ours.) As Horovitz, *supra,* points out at p. 78 *"Occupational diseases,* which are especially incident to particular employments, are generally held to be personal injuries, but compensation is usually denied on the ground that they are not 'by accident,' since they usually come from prolonged periods of exposure." Until our Legislature eliminates the requirement of an accident or expands the table of occupational diseases, cases like the present case will continue to remain uncompensated.

Compensation for diseases caused or aggravated by conditions of employment is a praiseworthy objective. But provision therefor must come by legislative provision, not by judicial fiat. The issue is not liberal interpretation of the statute or liberal application of its terms; we all agree that

such liberality must obtain in workmen's compensation cases. Here the insurmountable obstacle is that there is no basis for recovery under the requirement of an injury *by accident* which is found in our Act.

As in the field of torts, it is frequently difficult to apply precedents in workmen's compensation because of the difference in the facts of each case. *Atiles, Mgr.* v. *Industrial Commission,* 66 P.R.R. 744, and *Atiles, Mgr.* v. *Industrial Commission,* 69 P.R.R. 586, on which the beneficiary relies, are perhaps distinguishable on their facts from the present case. In Atiles I an employee already ill with grippe worked for a day chipping plaster from walls, using a chisel and a two-pound hammer. He inhaled considerable dust and sneezed frequently. He complained of a severe headache, and perspired freely. Because it was very sunny where he was working, the foreman changed him to another place where he could work in the shade. He never returned to work, and died of pneumonia five days later. It is not necessary for us to determine in the present case whether inhaling dust for a single day, and thereby aggravating the employee's illness and causing his death five days later, would meet the requirements we have laid down in this opinion. It could perhaps be argued that neither the cause nor result was gradual as in the instant case; and therefore that the concept of accident was not necessarily foreclosed in that case.

In Atiles II the employee worked for eight years during 5 or 6 months each year varnishing the interior of storage tanks. As a result, the latent asthma of the workman became active. The majority opinion pointed out, 69 P.R.R. at p. 589, that "The evidence submitted to the Commission was sufficient to show that the disease of the workman in this case *was limited to a specific period of time—two or three weeks before being taken to the hospital—*and that it was the immediate consequences of a series of trauma which the workman received in his bronchia by working under the

unfavorable conditions he did because of the gases and fumes which were driven off by the melted varnish and which he inhaled while he worked." (Italics ours.) Here the argument could perhaps be made that while the cause was too long—eight years to fit into the concept of accident, the result—development of asthma within two or three weeks—occurred within a sufficiently short and reasonably definite period of time so that it might perhaps be classified as an accident in accordance with the views heretofore noted.[9]

In view of the foregoing, we need not say in this case whether the two *Atiles* cases were wrongly or correctly decided on their facts. What we do wish to make clear is that we are setting aside the rationale on which they were decided. In those opinions this Court relied on cases and used language which was so broad that the rule seemed to be "that all diseases traceable to the work of the employer are compensable on the theory of 'an accident,' despite the fact that they are not included in the list of occupational diseases established by the Legislature." *Atiles, Mgr.* v. *Industrial Commission*, 69 P.R.R. 586, 597, dissenting opinion.

---

[9] The Commission held in the present case that Atiles II was distinguishable because it involved a workman who already had asthma which was aggravated by the conditions of his employment. In distinguishing Atiles II the Commission relied on our language in 69 P.R.R. at p. 595 reading as follows: "The cases cited as well as this case, fall within the category of those where, preexisting an arrested disease, the workman should be entitled to compensation for all the consequences attributable to the injury or injuries which by reason of the accident accelerated, revived or aggravated the disease. In the case at bar, the workman had asthma in an arrested condition and the fumes and gases which he was compelled to breathe, caused a continued trauma in his bronchia, which constitutes the accident, since it was this allergy to the fumes and gases which accelerated the asthmatic attacks, aggravated his disease and disabled him from work."

The Commission misunderstood the decision in Atiles II. This Court did not intend to confine the doctrine laid down therein to cases of aggravating a preexisting disease. A reading of the entire opinion discloses that the majority of the Court in that case were of the view that a compensable accident had occurred and that the workman would be entitled to compensation, whether the said accident either aggravated an existing disease or was the original cause of a new disease.

We now reject this thesis and hold instead that, in order to prove that an injury by accident occurred, it must be established (1) that the injury was due to an unexpected event or events and (2) that the injury must be traceable within reasonable limits to a definite time.[10] Applying those two requirements to the facts herein, we conclude that an injury by accident did not occur in this case.

The decision of the Industrial Commission will be affirmed.

Mr. Justice Negrón Fernández dissented.

---

[10] In *Atiles, Mgr.* v. *Industrial Commission*, 66 P.R.R. 744, 749, this Court relied on a quotation from Horovitz, *supra*, at pp. 147-8 reading as follows:

"*Diseases* do not necessarily arise out of the employment. But where a causal relation to the employment is shown, and there is evidence of repeated though minute traumas to the body, or bodily harm results from exposure or exertion, even over a period of months rather than at one specific time, the disease is compensable, whether as a brand-new disease, or as an aggravation of a pre-existing disease. Thus, inhalation of sand dust is considered as repeated trauma to the lungs, and if it aggravates a dormant tuberculosis, or causes silicosis, these diseases, being causally related to the employment, arise out of it. Aggravation of many usual as well as unusual types of diseases are clearly compensable. Thus many states have made awards on the ground that a *cancer* or malignant growth (whose cause is generally unknown) was aggravated and its spread hastened. Even a finding of original causation stands. Where an award is based on medical testimony that causal relation existed, it will stand, regardless of the court's private views on cancer."

The dissenting opinion in *Atiles, Mgr.* v. *Industrial Commission*, 69 P.R.R. 586, points out at p. 598, footnote 1, the error into which this Court fell in relying on the foregoing quotation from Horovitz. The language in question deals solely with the problem of the causal relation between the disease and the work of the employee. It appears in a section of the book where Horovitz is discussing the necessity of proving that the disease or injury arose out of employment. And on its face this language deals with that problem. It has nothing to do with the problem before us—where an accident occurred. As we have seen, in the instant case there is no question that causal relation exists between the disease and the conditions of employment. The crucial question in this case—injury by accident—is discussed by Horovitz not at pp. 147-8 but at pp. 84 and 78, which we have just quoted, and supports our view of this case.